Filed 8/25/21  P. v. Prado CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>EDUARDO PRADO,<br><br>　　　Defendant and Appellant. | B306412<br><br>(Los Angeles County<br>Super. Ct. No. TA142993) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Affirmed.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Eduardo Prado appeals from a judgment entered after a jury found him guilty of first degree murder, conspiracy to commit murder, attempted murder, and shooting at an occupied motor vehicle.  As to all four offenses, the jury found true the special allegations that a principal to the crimes personally and intentionally discharged a firearm.  As to the attempted murder offense only, the jury found true a gang enhancement allegation.  The trial court sentenced Prado to 50 years to life in prison.  On appeal, he contends:  (1) the trial court erred in declining to instruct the jury on self-defense; (2) the prosecutor committed prejudicial misconduct during closing argument by arguing Prado was guilty of the offenses charged in this case based on his prior, recent conviction for attempted murder, which conviction was admitted into evidence for the limited purposes of showing his intent to commit the charged offenses and as a predicate offense to prove the gang enhancement; and (3) the trial court should have granted his motion to suppress his statements to the police because he has an intellectual impairment which (a) prevented him from making a knowing and intelligent waiver of his *Miranda*[1] rights and (b) rendered his statements to the police involuntary.  Rejecting Prado's contentions, we affirm the judgment.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

## BACKGROUND

Evidence presented at trial supports the following factual account:[2]

## I. Prosecution Case

### A. On May 27, 2016, Defendant Prado Is Shot and His Fellow Gang Member Is Killed by Gunfire

At all times relevant to this case, Prado was a member of the 83rd Street BRS Clique of the Sur Trece criminal street gang, and his moniker was Droopy. On the evening on May 27, 2016—around 10 and a half months before the crimes in this case occurred—Prado was standing on Raymond Street in Compton (where he lived) with Martin Mendiola, a founding member and leader of the 83rd Street BRS Clique, whose moniker was Diablo. Someone opened fire on them, killing Martin Mendiola and striking Prado in the neck with a bullet. At the time of the shooting, Prado did not identify the shooter to the police. Around a year later, when he was in custody on an attempted murder charge that was not part of this case, Prado identified the May 27, 2016 shooter as Valentin Quintero, moniker "Psycho," from the Barrio Trece criminal street gang.

---

[2] Prado does not challenge the sufficiency of the evidence supporting his convictions in this case.

**B.** **In April 2017, Jose Mendiola, Martin Mendiola's Younger Brother, Is Jumped Into the Clique and Begins Searching for Quintero**[3]

Facebook messages between Prado and a fellow gang member (admitted into evidence at trial),[4] as well as Prado's statements to the police (also admitted into evidence at trial), indicate that on or about April 10, 2017, Martin's younger brother Jose (aka Serio) was courted or jumped into the 83rd Street BRS Clique of Sur Trece. A few days later, on April 13, 2017, at around 1:00 p.m., a man, later identified as Jose, and an unidentified man went to an address on Raymond Street in Compton (hereafter referred to as the Raymond Street address), and Jose told a resident there that he was looking for Quintero (Psycho).[5] Jose lied and told the resident he was a member of Quintero's gang. The resident told Jose that Quintero no longer lived at the address and provided Jose with Quintero's phone number. Jose and the unidentified man left in a white Honda Accord, which Jose was driving. The resident of the Raymond Street address called Quintero and told him a man was looking for him.

---

[3] Because they share the same surname, and to avoid confusion, we will hereafter refer to Martin and Jose Mendiola by their first names only.

[4] Prado's Facebook messages were extracted from a Facebook account bearing the name Yonatan Valdovinos. Prado confirmed to the police that this was his Facebook account, and Yonatan Valdovinos was a name he used.

[5] This resident of the Raymond Street address testified at trial.

**C.  Later, on April 13, 2017, Quintero and His Girlfriend, Alexiz Orona, Attempt to Kill Prado and Jose's Fellow Gang Member**

As set forth below in the chronology of events, Quintero's girlfriend, Alexiz Orona is the murder victim in the present case. Prado would later tell police that Orona used to be Martin's girlfriend, but she started dating Quintero prior to Martin's death.  According to Prado's statements to the police (which were admitted into evidence at trial), the bad blood between Martin and Quintero over the situation with Orona led Quintero to gun down Martin on May 27, 2016, around 10 and a half months before the events in this case.[6]  Prior to the May 27, 2016 shooting, Prado was unaware of any rivalry between his clique and Quintero's gang.  Prado told the police that he and Quintero had hung out together on Raymond Street—where Prado lived until the May 27, 2016 shooting—several times before Quintero and Martin began feuding.

Between 2:00 and 4:00 p.m. on April 13, 2017, Johnnyne Ramirez, an 83rd Street BRS Clique gang member, whose moniker was Froggy, was standing outside the home of her girlfriend Melissa Sosa's grandmother (where Ramirez and Sosa were staying), with Sosa, a family friend of Sosa's, and the family friend's young son.  Quintero drove up to the home in his black Acura vehicle and blocked the driveway, as Ramirez and her companions were about to enter a car parked in the driveway.  Orona was in the front passenger seat of Quintero's car.  According to Sosa's trial testimony, on April 13, 2017, Sosa knew

---

[6] As of the dates of the trial in the present matter, Quintero had not been arrested or charged with any crimes related to the shooting of Martin and Prado on May 27, 2016.

Quintero as Psycho from Barrio Trece, and she knew Orona had previously dated Martin, Ramirez's (and Prado's) fellow gang member.

From inside Quintero's car, Orona asked Ramirez and Sosa "how [they] were going to handle this" and if they "were trying to handle this in the alley," according to Sosa's trial testimony. Sosa did not know what Orona was referring to, but she was aware Orona and Ramirez had "had a situation" in the past. Sosa believed Orona was challenging Ramirez to a "fair one-on-one" fight. Sosa told her family friend to take her son to the backyard.

Orona exited Quintero's car, aimed a gun, and fired at Ramirez and Sosa. As Ramirez and Sosa moved to safety, Sosa heard Quintero say, " 'Finish her. Finish them.' " Orona fired again. Then Quintero and Orona left. No one was struck by gunfire.[7]

**D.    Jose Continues His Attempts to Locate Quintero During the Evening on April 13, 2017**

Beginning at 6:19 p.m. on April 13, 2017 and continuing to 6:18 p.m. the following day (the day Orona was killed), Jose's cell phone exchanged 71 text messages with Quintero's cell phone, attempting to ascertain Quintero's location. Apparently, Jose was continuing to pose as a fellow gang member or ally of Quintero, and Quintero responded to the messages, stating where

---

[7] Quintero was later convicted of the April 13, 2017 attempted murders of Ramirez and Sosa, and we affirmed the convictions on appeal. (*People v. Quintero* (Sept. 2, 2020, B300920) [nonpub. opn.].) Orona was not charged with these attempted murders, as she was killed the day after they occurred, as explained below.

he was and where he would be at various times between April 13 and 14.

At around 7:00 p.m. on April 13, 2017, Orona's grandmother's dog was shot in the face in the backyard of a home in Buena Park where Orona lived with her grandmother. Surveillance video taken near the time of the shooting showed a white car, that looked like Jose's Honda Accord, driving toward the alley behind Orona's grandmother's home. A criminalist testified at trial that in her opinion, the bullet removed from the dog's face was fired from a handgun later found in Jose's bedroom during the investigation conducted in this case.

Between 9:00 and 10:00 p.m. on April 12, 2017, Jose returned to the Raymond Street address, looking for Quintero, according to the resident who lived there.

### E.     On April 14, 2017, Orona Is Shot and Killed

In the late afternoon on April 13, 2017, Prado sent fellow gang member Eduardo Lopez a Facebook message, stating, "You got da thang thang foo [*sic*]." At around 10:00 a.m. on April 14, 2017, Lopez responded, "Yea yea." Prado replied, "Yeah I might use it today." Prado further explained through Facebook messages that he did not have a ride to take him to Lopez's location to pick up the item. Lopez indicated he would see if Froggy (Ramirez) could pick it up, stating, "She needs it no!" Prado replied, "Nah she got one already[.] I need one." About an hour later, Prado sent Lopez a Facebook message, stating, "I'm outside." The prosecution's theory at trial was that this exchange of Facebook messages between Prado and Eduardo Lopez was in reference to a gun.

During an exchange of Facebook messages between Prado and another associate at around 1:00 p.m. on April 14, 2017,

Prado informed the associate that he was "lurking around" with Froggy (Ramirez).

Also around 1:00 p.m. on April 14, 2017, Jose returned to the Raymond Street address to look for Quintero. The same resident again informed Jose that Quintero did not live there. The resident's girlfriend took photos of Jose and the white Honda Accord Jose was driving. Jose continued to exchange text messages with Quintero, attempting to ascertain Quintero's location. At around 1:15 p.m.—15 minutes after Jose's last visit to the Raymond Street address—Quintero responded to one of Jose's text messages, stating he (Quintero) would be heading over to the Raymond Street address. For the next several hours, Jose periodically texted Quintero to find out where he was and when he would be outside the Raymond Street address.

At around 5:00 p.m. on April 14, 2017, Melissa Moreno, who had a friend in common with Quintero's girlfriend Alexiz Orona, went to the Raymond Street address to meet Orona about purchasing a phone Orona wanted to sell.[8] When Moreno pulled up in her white, two-door Toyota, Orona and Quintero were standing outside, and Quintero's black Acura was parked in front of the Raymond Street address. Upon seeing Moreno's car, Orona appeared frightened, and she said to Moreno, " 'Oh, shit, I thought you were Janine [*sic*]," apparently referring to Johnnyne Ramirez, whom Orona had shot at the day before.

Moreno drove Orona and Quintero to a cell phone store where she (Moreno) was employed to determine if the cell phone Orona wanted to sell was locked or could be used. Moreno discovered the cell phone was locked, so she decided not to buy it.

---

[8] Melissa Moreno testified at trial.

She asked Orona and Quintero if they wanted her to take them back to the Raymond Street address, and they responded affirmatively. As they walked back to Moreno's car, Moreno heard Orona say to Quintero, " 'Baby, didn't she have a white car?' " Quintero climbed into the backseat, and Orona the front passenger seat, of Moreno's car.

When Moreno turned onto Raymond Street, she heard Orona tell Quintero, " 'Babe, babe, baby, that's the car,' " referring to a white car (that appeared to Moreno to be a Honda or a Camry) parked near the Raymond Street address. Moreno heard Quintero respond, " 'Shoot, mama, shoot.' " Orona fired a gun at the white car. "[A]lmost at the same time," according to Moreno's trial testimony, return gunfire came from inside the white car. Orona was shot, and she slumped onto the dashboard. Moreno immediately raced Orona to the hospital, where Orona died from two fatal gunshot wounds.[9]

Sosa testified at trial that when Ramirez (Froggy) returned to Sosa's grandmother's house at around 8:00 p.m. on April 14, 2017, Ramirez was crying and appeared distraught. Ramirez told Sosa that Orona was dead and added, " 'I did something.' " After Ramirez was arrested for Orona's murder, Ramirez asked Sosa during a phone call to delete her (Ramirez's) Facebook messages and, specifically, messages containing gang-related photographs.

---

[9] A woman who lived on Raymond Street identified Jose as the driver of one of the vehicles involved in the April 14, 2017 shootout. She stated during her trial testimony that she did not see anyone else in the car Jose was driving. The same woman identified Jose as a person she had seen at the Raymond Street address at 1:00 p.m. on April 13, 2017.

One of the investigating officers in this case, Los Angeles County Sheriff's Department (LASD) Detective Eduardo Aguirre, testified at trial that when he interviewed Sosa during his investigation, Sosa told him that when Ramirez returned home at around 8:00 p.m. on April 14, 2017, she appeared upset, and she said she (Ramirez) was present when Orona was shot and killed.

**F.    Prado Gives Statements to the Police About the May 27, 2016 and April 14, 2017 Shootings While He Is in Custody on a Charge in Another Case**

On April 26, 2017, Prado was arrested on an attempted murder charge that was brought in another case. The same day, while Prado was in custody for that other charge, Detective Aguirre, the investigating officer in this case, and LASD Detective Alberto Hernandez, the investigating officer in that other attempted murder case, interviewed Prado. Aguirre testified at the trial in this case that Prado admitted to the detectives during the April 26, 2017 interview that he was a member of the BRS Clique of Sur Trece. He also told the detectives that Ramirez (Froggy) and Jose (Serio) were members of the BRS Clique of Sur Trece and that Jose had a .32 caliber revolver.

The following day, on April 27, 2017, LASD Detective Ray Lugo and Sergeant Joe Ramirez interviewed Prado regarding the May 27, 2016 shooting of Martin and Prado in which Martin was killed. The interview was video recorded, and the prosecutor played the video for the jury at the trial in this case. A transcript of the interview is included in the record on appeal. During this April 27, 2017 interview, Prado identified Quintero (Psycho) in a six-pack photographic lineup as the person who shot him and Martin on May 27, 2016. Prado stated that Quintero killed

10

Martin over a dispute regarding a female who used to be Martin's girlfriend but was dating Quintero at the time of this shooting. Prado knew her by the name "Nanis." Prado told the officers he did not identify Quintero as the shooter at the time the shooting occurred because he was afraid for his life. He explained that he and Quintero had hung out near his (Prado's) house on Raymond Street four or five times, drinking and smoking, before the feud between Martin and Quintero began. According to Prado, the members of his gang and Quintero's gang used to get along before the dispute over Nanis.

Detective Aguirre also testified at trial about a May 5, 2017 interview he conducted with Prado. During this interview, Prado told Aguirre that Martin was the founder and a leader of the 83rd Street BRS Clique of Sur Trece, and Martin had courted or jumped him into the gang.

On November 8, 2017, Detective Aguirre and his partner Detective Camarillo interviewed Prado regarding the shooting at issue in this case—the April 14, 2017 shooting in which Orona was killed. The interview was audio recorded, and the prosecutor played the audio recording for the jury at the trial in this case. A transcript of the interview is included in the record on appeal. Before questioning Prado about the April 14, 2017 shooting, Aguirre advised Prado of his *Miranda* rights.

During this November 8, 2017 interview, Detective Aguirre reviewed with Prado the Facebook messages summarized above, and Prado confirmed the messages were from his Facebook account. He did not deny Aguirre's assertion that the Facebook messages between him and Eduardo Lopez on April 14, 2017 were about him (Prado) arranging to pick up a gun from Lopez.

11

Prado initially denied he was present when Orona was killed on April 14, 2017. He told the detectives he had been with Ramirez (Froggy) earlier that day, "lurking" in South Central Los Angeles, but then she left to go out with Jose (Serio). Prado said he was in South Central Los Angeles with an associate when Ramirez called and told him about the shooting and her and Jose's involvement in it. Ramirez indicated to Prado that she had killed Orona. Detective Camarillo told Prado his cell phone records established he was with Jose and Ramirez at the time Orona was killed.[10] Prado maintained he was not with them, and he did not fire a gun at Quintero or Orona that day. Camarillo asked Prado if he left his cell phone in Jose's car. Prado said he did not remember; then he said he thought he left his phone in Jose's car; and then he again said he did not remember.

Prado admitted he had obtained a gun from Eduardo Lopez, a .38 revolver. He said he learned the gun did not work when he and Ramirez tried to shoot it in an alley on April 13 or 14, 2017, prior to Orona's killing. He said he gave that gun to Ramirez. Prado also told the detectives that Ramirez had obtained a nine-millimeter gun from an associate named Racoon prior to the April 14, 2017 shooting, and Jose had a .22 caliber revolver.

Detective Camarillo asked Prado if he shot a gun from inside Jose's car, and Prado denied it. Then Camarillo asked him who shot from inside Jose's car. Detective Aguirre interjected and asked Prado if he knew "what ballistics are." Prado responded, "Alright man, Serio [Jose] shot." From that point in

_____

[10] To the extent such cell phone records existed, they were not introduced at trial.

12

the interview, Prado conceded he was present when Orona was killed, and he provided the detectives with his account of what happened.

Prado told the detectives that he, Jose, and Ramirez were parked on a corner of Raymond Street in Jose's car for 30 to 40 minutes before the car carrying Quintero and Orona arrived. Jose was in the driver seat, Prado was in the front passenger seat, and Ramirez was in the backseat. They were hanging out smoking.

A white car pulled around the corner. Jose alerted Prado and Ramirez that Quintero (Psycho) was in that car. Prado told the detectives there were two males and a female in the white car. Prado saw Quintero in the backseat. Orona was in the front passenger seat. Prado did not know who was driving that car. He believed he had seen the car near Ramirez's house some months before.

According to Prado, Quintero jumped out of the car and began shooting at the driver side window of Jose's car where Jose was sitting. Quintero shot out the window. Prado believed Orona exited the car with Quintero. Jose jumped out of his car and returned fire, shooting six to eight times. Prado did not shoot because the gun he obtained from Eduardo Lopez did not work. Ramirez stuck her arm out the driver side window of Jose's car and fired her gun at Quintero and Orona. Prado conceded Jose was angry that Quintero killed his brother Martin, and Jose "wanted to get him [Quintero]."

Jose drove away. Prado believed the other car was behind them. Jose drove to South Central Los Angeles, where he, Ramirez, and Prado smoked and hung out for several hours before Prado went home.

Toward the end of the November 8, 2017 interview, Prado asked the detectives, "So I got a new case?" Detective Aguirre told Prado the District Attorney would decide what to do with the information the detectives gathered about the April 14, 2017 shooting. Prado told the detectives he was not present during the February 12, 2017 shooting for which he was in custody and charged with attempted murder.

### G.     The Prosecution's Gang Evidence

On appeal, Prado does not challenge the gang enhancement, so our discussion of the prosecution's gang evidence will be brief. Detective Hernandez, the investigating officer on a February 2017 attempted murder for which Prado was charged and convicted before the trial in this case, testified as the prosecution's gang expert in this case. The trial court allowed the prosecution to present evidence of the February 2017 attempted murder for the limited purposes of showing Prado's intent to commit the offenses charged in this case and as a predicate offense to prove the gang enhancement.[11]

Detective Hernandez testified that on February 12, 2017, someone opened fire on two people, one of whom was an associate of a rival gang of Prado's gang. When Hernandez interviewed Prado about this shooting, Prado denied involvement. He initially told Hernandez that the persons who committed the shooting called him and told him about it. Later, he told Hernandez that the persons who committed the shooting came to his home and told him about it. Prado identified the shooter as Miguel Sanchez, a fellow Sur Trece gang member. Sanchez and

---

[11] On appeal, Prado does not challenge the trial court's admission of evidence of this prior conviction.

14

Prado were convicted of attempted murder with a gang enhancement in the case arising from the February 12, 2017 shooting.

After testifying to his expertise regarding Prado's gang and rival gangs, Detective Hernandez opined that a hypothetical shooting committed under the circumstances present here would be committed in association with, at the direction of, and for the benefit of the perpetrators' criminal street gang.

## II.  Defense Case

Detective Lugo, the investigating officer in the May 27, 2016 shooting of Martin and Prado, testified that after Prado's arrest in April 2017, he received a call from Prado's mother, requesting that Prado be given two medications for bipolar disorder.  Lugo contacted the jail and relayed Prado's mother's request.  He did not know if the jail provided the medication to Prado.  Lugo contacted the jail solely at Prado's mother's request and not because he observed signs indicating that Prado needed bipolar medication.

Susie Morris, a psychiatrist at Los Angeles County USC Medical Center, testified she was appointed by the trial court at defense counsel's request to examine Prado to determine if he had any mental health problems.  She found Prado met the clinical criteria for intellectual disability and cannabis use disorder in remission.  She believed Prado had a moderate intellectual impairment.  She did not test his I.Q. or conduct any neuropsychological testing.

15

### III.  Verdicts and Sentence

The jury found Prado guilty of the first degree murder of Orona (Pen. Code, § 187, subd. (a)),[12] conspiracy to commit murder (§ 182, subd. (a)(1)), the willful, deliberate, and premedicated attempted murder of Quintero (§§ 664 & 187, subd. (a)), and shooting at an occupied vehicle (§ 246).  As to all four offenses, the jury found true the special allegations that a principal personally and intentionally discharged a firearm. (§ 12022.53, subds. (b)-(d) & (e)(1).)  The jury found the gang enhancement allegation (§ 186.22, subd. (b)) to be true as to the attempted murder of Quintero and not true as to the other offenses.

The trial court sentenced Prado to 50 years to life in prison: for the murder, 25 years to life; and for the attempted murder, a consecutive life term, plus 25 years to life for the firearm enhancement.  The court stayed the gang and other firearm enhancements on the attempted murder count.  The court imposed and stayed the sentence for conspiracy to commit murder and imposed a concurrent term of seven years (the high term) for shooting at an occupied vehicle.

### DISCUSSION

### I.  The Trial Court Did Not Err in Declining to Instruct the Jury on Self-Defense

#### A.  Proceedings below

Prado requested the trial court instruct the jury on self-defense.  Specifically, defense counsel focused his argument to the trial court on CALJIC No. 5.50.1, which provides: "Evidence has been presented that on [a] prior occasion[s] the alleged victim

---

[12] Undesignated statutory references are to the Penal Code.

16

[threatened] [or] [assaulted] [or participated in an assault or threat of physical harm upon] the defendant.  If you find that this evidence is true, you may consider that evidence on the issues of whether the defendant actually and reasonably believed [his] [her] life or physical safety was endangered at the time of the commission of the alleged crime.  [¶]  In addition, a person whose life or safety has been previously threatened, or assaulted by [another] [others] is justified in acting more quickly and taking harsher measures for self protection from an assault by [that person] [those persons], than would a person who had not received threats from or previously been assaulted by the same person [or persons]."  After hearing argument by both parties and considering the facts presented at trial, the court ruled there was no substantial evidence supporting a self-defense theory.

## B.     Applicable law and analysis

"The trial court is charged with instructing upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.)  " 'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt." '  [Citation.]  'On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence – evidence that, if believed by a rational jury, would have raised a reasonable doubt as to' an element of the crime in question." (*People v. Mitchell* (2019) 7 Cal.5th 561, 583.)

There is no substantial evidence in the record indicating any occupant of Jose's car fired a gun at Quintero or Orona in

17

self-defense on April 14, 2017. For 24 hours prior to the shooting, Jose exchanged 71 text messages with Quintero, attempting to ascertain Quintero's whereabouts. Quintero informed Jose he would be at the Raymond Street address. Jose, Ramirez, and Prado armed themselves with firearms and headed to the Raymond Street address, where Quintero's car was parked outside. They waited in Jose's car for 30 to 40 minutes. Evidence presented at trial indicated each of them was angry with Quintero: Jose, because Quintero had shot and killed his brother Martin; Prado, because Quintero had shot him in the neck; and Ramirez, because Quintero had ordered Orona to open fire on her and her girlfriend just the day before. If Prado feared for his safety based on Quintero's past actions, as Prado's counsel argued to the trial court, it would make no sense for him to go and sit at a location where he had good reason to know Quintero would be.

Prado argues the fact he conspired to murder Quintero does not mean he and his coconspirators lost their right to self-defense once they arrived at Quintero's location.[13] He asserts they did nothing to provoke Quintero's or Orona's aggression, and Moreno testified Orona fired the first shot on April 14, 2017. Therefore, according to Prado, substantial evidence demonstrates Jose and Ramirez fired at Quintero and Orona in self-defense after Orona fired the first shot. We disagree. Moreno also testified that the return fire was basically simultaneous with Orona's first shot, indicating Jose and Ramirez were not ambushed or taken by surprise; they were armed and ready to strike Quintero as soon

_____

[13] Prado concedes his self-defense theory does not apply to the conspiracy charge.

as he appeared.  The trial court did not err in declining to instruct the jury on self-defense.

## II.    The Prosecutor Did Not Commit Prejudicial Misconduct

Prado contends the prosecutor committed prejudicial misconduct during closing argument by using Prado's prior attempted murder conviction for a purpose for which it was not admitted.

### A.    Proceedings below

Over Prado's objection, the trial court admitted evidence of Prado's prior attempted murder conviction arising from the February 2017 shooting of a rival gang associate for the limited purposes of showing his intent to commit the charged offenses (Evid. Code, § 1101, subd. (b)) and as a predicate offense to prove the gang enhancement.  Prado does not challenge this ruling on appeal.[14]

Prado concedes that at times during closing argument, the prosecutor properly referred to the prior conviction as evidence tending to show Prado's intent to commit the charged offense: "Now every time you see this intent to kill, you can consider what Mr. Prado did just two months before this murder, two months

---

[14] In asking the trial court to allow the prosecution to present evidence of Prado's prior conviction for attempted murder with a gang enhancement, the prosecutor argued "the striking similarity" between the prior offense and the charged offenses. The prosecutor informed the court that Prado was the driver of a car in which three other members of his gang were passengers, and one of them exited the car and committed "a walkup" shooting.  At trial, evidence of these specific circumstances of the prior February 12, 2017 shooting was not presented to the jury.

19

before this shooting, where he attempted to murder another person."

Prado argues, however, that the prosecutor improperly used the prior conviction in closing argument in the following instances:

(1) "This was the time when he had told the detectives I heard about it.  First, I heard about it on the phone.  No, they actually told me about it, but we knew he actually did it because he was convicted of it, an attempted murder which includes an intent to kill similar to how we heard in this case [*sic*].  He talked about I heard about it, they told me about it, they called me, they came over, whatever it was when we know he was actually there and he was in on it the whole time."

(2) "As you saw from the instructions, it doesn't matter whether or not he's the one that pulled the trigger, whether or not he was being truthful after downplaying his role many times, 'Oh, no.  No, it was actually Serio and Froggy and my gun didn't work,' whether or not that was one of many times where he was still trying to minimize his role, just like how he had said, 'No, no, I heard that they did this, but I wasn't actually there,' until we know that he was.  Just like when he had said, 'Oh, I heard about this attempted murder just two months earlier,' when we know that he did it too."

(3) [Referring to the certified dockets in the criminal case arising from the prior February 12, 2017 shooting] "This is with Miguel Angel Martinez Sanchez, Weasel, the person that Mr. Prado had said was a member of his gang, the person that Mr. Prado had said was a member of his clique, the person that Mr. Prado had said was the one that actually did the shooting on February the 27th [*sic*], 2017, when Mr. Prado said initially, 'I

20

heard about it,' 'I was called about it,' 'somebody came over and they told me about it.' We actually know that he did it."

(4) "This man's a murderer, straight up, no doubt, this man committed attempted murder, absolutely on multiple occasions."

In short, Prado challenges the prosecutor's arguments that Prado's denials of the prior crime were just like his denials of the charged offenses and therefore tend to show his guilt of the charged offenses.[15]

## B. Applicable law and analysis

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44; *People v. Cash* (2002) 28 Cal.4th 703, 733.)

---

[15] Prado only objected to one of the prosecutor's arguments that he now challenges on appeal (number 2 set forth above), and the trial court overruled his objection. We conclude this objection was sufficient to preserve his claim of prosecutorial misconduct. In any event we would address the merits of the claim because Prado raises an ineffective assistance of counsel claim to the extent we were to conclude his claim was forfeited.

The trial court correctly instructed the jury on the proper consideration of other crimes evidence—a fact Prado does not dispute. The court's instructions informed the jury:

"Evidence has been introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial.

"This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show:

"The existence of the intent which is a necessary element of the crime charged.

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

"You are not permitted to consider such evidence for any other purpose."

In light of the trial court's instructions, we have no reason to believe the jury construed the prosecutor's arguments to mean it could find Prado guilty of the charged offenses simply because he denied committing a prior crime for which he was convicted, or because he had a disposition to commit these sorts of crimes. Accordingly, Prado's claim of prosecutorial misconduct fails.

## III. The Trial Court Did Not Err in Denying Prado's Motion to Suppress His November 8, 2017 Statements to Police

Prado contends the trial court should have suppressed his November 8, 2017 statements to police (summarized above) because he has an intellectual impairment which (1) prevented him from making a knowing and intelligent waiver of his

*Miranda* rights and (2) rendered his statements to the police involuntary.

In support of his motion to suppress the statements, Prado submitted to the trial court a November 12, 2018 report prepared by Susie Morris, the psychiatrist who testified for the defense at the trial in this case (as set forth above). Dr. Morris was appointed by the trial court in Prado's other attempted murder case to determine if Prado had a mental illness and, if so, what were the appropriate treatment recommendations. Consistent with her trial testimony in this case, Dr. Morris stated in the report that she found Prado met the clinical criteria for intellectual disability and cannabis use disorder in remission. She also stated in the report that Prado's "emotional range was superficial and immature, consistent with someone much younger than his stated age of 22." Dr. Morris concluded Prado did not have depression, bipolar disorder, a mood disorder, or schizophrenia. Notwithstanding this conclusion, she recommended Prado continue taking the psychotropic medications prescribed to him in jail because "psychotropic medications are often used to target behavioral symptoms of intellectual disabilities."

Prado also submitted to the trial court with his motion to suppress his statements a June 2013 report prepared by a community services agency when Prado was 16 years old. After conducting a battery of tests to assess Prado's intellectual capacity, the agency concluded, "he qualifies for a diagnosis of Moderate Mental Retardation, as his intellectual functioning falls in the Deficient range."

At the hearing on Prado's motion to suppress his statements, the trial court stated it had reviewed recordings of

Prado's five interviews with police.  We, too, have reviewed the five recordings:  a 26-minute interview on April 26, 2017, an 18-minute interview on April 27, 2017, a 14-minute interview on April 28, 2017, a one-hour interview on May 5, 2017, and a one-hour interview on November 8, 2017.

The trial court stated that while listening to the recordings the court did not observe "an intellectual impairment prohibiting the understanding of the rights or understanding what's going on."  The court noted that during the April 26, 2017 interview, Prado asked the detective if he was going to be charged with a gang enhancement based on his answers to questions.  The court also noted that during the interviews Prado often corrected detectives when they cited incorrect information, such as a date when something occurred.  Specifically with respect to the November 8, 2017 interview that Prado argues the court should have suppressed, the court commented, "he is not simply agreeing to everything that the officers were saying.  He's stopping them.  He's correcting certain answers."

In denying Prado's motion to suppress his statements to police, the trial court concluded:  "I think it's very clear that the statements were of a voluntary nature and that there was no intellectual impairment, at least to these -- to the interview [*sic*] that would impair him answering questions or understanding his rights so much so to not even assess the -- if the officers had repetitive, threatening, or deceptive, or suggestive questions, but I will, and there was no evidence of that.  It was -- much of the questioning was very friendly in nature and there was laughter back and forth.  So with the line of cases that discuss what is not voluntarily [*sic*], it seemed absolutely clear beyond any doubt

24

that the statements were voluntarily [*sic*] based upon what I have seen thus far."

### A. The Record Does Not Show Prado Lacked the Intellectual Capacity to Make a Knowing and Intelligent Waiver of His *Miranda* Rights

A "valid waiver of *Miranda* rights may be express or implied. [Citations.] A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights." (*People v. Cruz* (2008) 44 Cal.4th 636, 667.)

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.)

" ' "The scope of our review of constitutional claims of this nature is well established. We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained." ' " (*People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1170.)

25

We note the record contains no opinion from a medical professional stating Prado lacked the intellectual capacity to make a voluntary, knowing, and intelligent waiver of his *Miranda* rights. Dr. Morris's report does not speak to this question. "Neither a low I.Q. nor any particular age of minority is a proper basis to assume lack of understanding, incompetency, or other inability to voluntarily waive the right to remain silent under some presumption that the *Miranda* explanation was not understood." (*In re Brian W.* (1981) 125 Cal.App.3d 590, 603.)

Prado's appellate counsel argues Prado "viewed the world as a child. Childishly, he would be motivated to please officers, who were authority figures who were treating him kindly. His intellectual disability would not allow him to reason critically as an adult in order to understand that their interests were adverse to his." After reviewing the recordings of the interviews, we agree with the trial court that there is no indication Prado suffered from an intellectual impairment that interfered with his ability to voluntarily, knowingly, and intelligently waive his *Miranda* rights. Absent an expert medical opinion to the contrary, we have no cause to disturb the trial court's ruling.

**B.      The Record Does Not Show Prado's November 8, 2017 Statements to Police Were Involuntary**

"A defendant's admission or confession challenged as involuntary may not be introduced into evidence at trial unless the prosecution proves by a preponderance of the evidence that it was voluntary. [Citations.] A confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity. [Citations.] On appeal, we review independently the trial court's determination on the ultimate legal issue of voluntariness. [Citation.] But any factual

26

findings by the trial court as to the circumstances surrounding an admission or confession, including ' "the characteristics of the accused and the details of the interrogation" [citation],' are subject to review under the deferential substantial evidence standard.  [Citation.]

"In deciding the question of voluntariness, the United States Supreme Court has directed courts to consider 'the totality of circumstances.'  [Citations.]  Relevant are 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'  [Citation.]"  (*People v. Williams* (1997) 16 Cal.4th 635, 659-660.)  "The question is whether defendant's will was overborne."  (*People v. Mays* (2009) 174 Cal.App.4th 156, 164.)

The totality of the circumstances demonstrates Prado's statements were voluntary.  There was nothing coercive about any of the five interviews.  None was burdensome in length.  The questioning was friendly.  Throughout, Prado was actively engaged and demonstrated an understanding of the process and what was at stake.

Prado's appellate counsel asserts Prado's intellectual disability rendered his November 8, 2017 statements to police involuntary.  The record is devoid of evidence supporting this assertion.  Counsel argues the detectives' refusals to accept Prado's denials that he was at the scene of the April 14, 2017 shooting constituted a coercive interrogation tactic in light of Prado's intellectual disability.  Counsel added:  "But when it became clear that the officers would not accept his denials, appellant then began to recite inaccurate facts about the incident,

27

to please the interrogators.  This demonstrates how the mentally disabled will agree to and offer inaccuracies in order to please their interrogators and how they will childly seek to please authority figures."  The theory that Prado eventually confessed his involvement due to his intellectual disability is based on pure speculation.  Nothing in our review of the record indicates this was the case.  The trial court did not err in denying Prado's statements to police.

In support of his argument the trial court should have suppressed his November 8, 2017 statements to police, Prado relies on *U.S. v. Preston* (9th Cir. 2014) 751 F.3d 1008, in which the Ninth Circuit explained " 'the increased vulnerability of a mentally disabled suspect, and his or her naiveté, ignorance, confusion, suggestibility, delusional beliefs, extraordinary susceptibility to pressure, and similar considerations may make it possible for law enforcement officers to induce an involuntary statement by using techniques that would be acceptable in cases involving mentally typical suspects.' " (*Id.* at p. 1022.)  There, the Ninth Circuit concluded:  "Considered all together, the various factors here—Preston's severe intellectual impairment; the police's repetitive questioning and the threats that it would continue without end; the pressure placed on Preston to adopt certain responses; the use of alternative questions that assumed his culpability; the officers' multiple deceptions about how the statement would be used; the suggestive questioning that provided details of the alleged crime; and the false promises of leniency and confidentiality—leave us convinced that Preston's will was overborne and his statement involuntary." (*Id.* at pp. 1027-1028.)  Here, as set forth above, mindful of the evidence of Prado's intellectual impairment, and based on our review of the

recordings of his police interviews, we conclude Prado's waiver of his *Miranda* rights was voluntary, knowing, and intelligent, and his statements were voluntary and not the product of coercive tactics by the detectives.

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED


CHANEY, J.

We concur:


ROTHSCHILD, P. J.


CRANDALL, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.